# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAMOR SAESEE,<br><br>                 Plaintiff,<br><br>   v.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>              Defendant. | ) 1:08-cv-00117-GSA<br>)<br>) DECISION AND ORDER DENYING<br>) PLAINTIFF'S SOCIAL SECURITY<br>) COMPLAINT (DOC. 1)<br>)<br>) ORDER DIRECTING THE ENTRY OF<br>) JUDGMENT FOR DEFENDANT MICHAEL J.<br>) ASTRUE, COMMISSIONER OF SOCIAL<br>) SECURITY, AND AGAINST PLAINTIFF<br>) NAMOR SAESEE<br>) |

      Plaintiff is proceeding in forma pauperis and with counsel with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) finding that Plaintiff, who had previously been determined to have been disabled as of August 26, 2002, was no longer disabled as of April 1, 2005. (A.R. 14-20.) The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1), and pursuant to the order of Judge Oliver W. Wanger filed on October 30, 2008, the matter has been assigned to the Magistrate Judge to conduct all further proceedings in this case, including entry of final judgment.

      The decision under review is that of Social Security

Administration (SSA) Administrative Law Judge (ALJ) Stephen W. Webster, dated June 8, 2007 (A.R. 14-20), rendered after a hearing held on January 10, 2007, at which Plaintiff appeared and testified with the assistance of a Lahu interpreter and an attorney (A.R. 14). Plaintiff's husband and Jose L. Chaparro, a vocational expert (VE), also testified. (Id.)

The Appeals Council denied Plaintiff's request for review of the ALJ's decision on November 15, 2007 (A.R. 4-6), and thereafter Plaintiff filed the complaint in this Court on January 23, 2008. Plaintiff's brief was filed on July 31, 2009, and Defendant's cross-motion for summary judgment was filed on August 26, 2009. Plaintiff's reply brief was filed on September 28, 2009. The matter has been submitted without oral argument to the Magistrate Judge.

I. Jurisdiction

This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), which provide that an applicant suffering an adverse final determination of the Commissioner of Social Security with respect to disability or SSI benefits after a hearing may obtain judicial review by initiating a civil action in the district court within sixty days of the mailing of the notice of decision. Plaintiff timely filed her complaint on January 23, 2008. 42 U.S.C. § 405(g), (h); 20 C.F.R. §§ 422.210(c), 404.981, 404.901; Fed. R. Civ. P. 6(a).

II. Standard and Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations,

the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See, Sanchez v. Secretary of Health and Human Services, 812 F.2d

3

509, 510 (9th Cir. 1987); <u>Jones v. Heckler</u>, 760 F.2d at 995. If the Court concludes that the ALJ did not use the proper legal standard, the matter will be remanded to permit application of the appropriate standard. <u>Cooper v. Bowen</u>, 885 F.2d 557, 561 (9th Cir. 1987).

III. <u>Continuing Disability</u>

A. <u>Legal Standards</u>

In order initially to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that the claimant is not only unable to do the claimant's previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden of establishing a disability is initially on the claimant, who must prove that the claimant is unable to return to his or her former type of work; the burden then shifts to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as her age, education and last fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1275 (9th Cir. 1990).

Here, the applicant was initially found to have been disabled; the Commissioner thereafter determined that the

4

disability ceased.

With respect to determining whether an individual's disability continues, the regulations provide for a seven-step, sequential analysis. 20 C.F.R. § 416.994(b)(5)[1]. First, it must be determined if the person has an impairment or combination thereof which meets or equals the severity of an impairment listed in appendix 1 of subpart P of part 404 (the listings). 20 C.F.R. § 416.994(b)(5)(i). Second, if not, the adjudicator will consider whether there has been medical improvement, as defined in § 416.994(b)(1)(i). § 416.994(b)(5)(ii). Third, if there has been medical improvement as shown by a decrease in medical severity, then it must further be determined whether it is related to the person's ability to do work, that is, whether there as been an increase in the person's residual functional capacity (RFC) based on the impairments(s) present at the time of the most recent favorable medical determination. § 416.994(b)(5)(iii). Fourth, if there has been no medical improvement, or if the medical improvement is not related to the person's ability to do work, it must be determined if any of the exceptions set forth in § 416.994(b)(3) or (4) apply; if no exceptions apply, then the person's disability will continue; if an exception from the second group of exceptions to medical improvement applies, then the disability will be found to have ended. § 416.994(b)(5)(iv). Fifth, if medical improvement is related to the person's ability to work or if one of the first group of exceptions to medical improvement applies, then it must be determined if all the

---

[1] All references to the Code of Federal Regulations are to the 2008 version unless otherwise noted.

person's current impairments, in combination, are severe (i.e.,
whether they significantly limit the person's physical or mental
abilities to do basic work activities); if they are not severe,
then the person will be found no longer disabled. 20 C.F.R. §
416.994(b)(5)(v). Sixth, if the person's impairments are severe,
then it must be determined whether the person has the RFC to
perform any work he or she has done in the past; if the person
can perform past work, then the person's disability will be found
to have ended. § 416.994(b)(5)(vi). Seventh, if the person does
not have the RFC to perform past work, it must be determined if
considering the person's RFC, age, education, and past work
experience, the person is able to do other work; if so, then the
disability will be found to have ended; if not, then the
disability will continue. § 416.994(b)(5)(vii).

B. The ALJ's Findings

The ALJ found that the most recent favorable medical
decision finding Plaintiff disabled was dated March 3, 2003, when
it had been determined that Plaintiff had been disabled as of
August 26, 2002; this was the "comparison point decision," or
CPD. (A.R. 14-15.) At the time of the CPD, Plaintiff had
medically determinable impairments of thrombocytopenia,
depression, and post-traumatic stress disorder that resulted in a
restriction to light work and inability to perform basic work
activities on a sustained basis, difficulty relating
appropriately to others, and difficulty adapting appropriately to
changes in the work setting. (A.R. 15.) Plaintiff did not develop
any additional impairment after the CPD through April 1, 2005;
further, Plaintiff's thrombocytopenia was no longer a severe

6

impairment. (A.R. 16.) As of April 1, 2005, medical improvement occurred, and Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of a listed impairment; further, Plaintiff on that date had the RFC to perform simple, routine, and repetitive work at all exertional levels. (A.R. 17.) Plaintiff's medical improvement was related to the ability to work because it resulted in an increase in her RFC; although her impairments were severe, Plaintiff, who had no past relevant work, was a younger individual aged eighteen through forty-four, and was illiterate and unable to communicate in English, was nevertheless able to perform a significant number of jobs in the national economy. As of April 1, 2005, Plaintiff was able to perform unskilled jobs, including jobs to which the VE specifically testified, including commercial cleaner, poultry offal icer, and brush clearing laborer, which were consistently represented in the <u>Dictionary of Occupational Titles</u> (DOT). (A.R. 19-20.)

C. <u>Plaintiff's Contentions</u>

Plaintiff argues that the ALJ wrongly found that Plaintiff's thrombocytopenia was no longer severe, that no new impairments had arisen, that Plaintiff's impairments did not meet or equal a listed impairment, that Plaintiff had not performed any past relevant work, that there had been medical improvement, and that Plaintiff had the RFC to perform work that existed in significant numbers in the national economy. Plaintiff argues that the ALJ's decision was based on improper legal standards and was not supported by substantial evidence. (Brief. p. 8.)

Plaintiff specifically contends that the ALJ failed to state

7

specific, legitimate reasons for rejecting the assessments of treating physician Dr. Kuo, and that the ALJ's conclusions as to Plaintiff's condition were not supported by the opinions of the consulting examiner and of Plaintiff's surgeon's after Plaintiff's operation. The ALJ failed to state legally sufficient reasons for rejecting Plaintiff's subjective claims and the testimony of Plaintiff's husband and of a third party witness. The ALJ erred by failing to perform a function-by-function RFC assessment and failed to consider Plaintiff's severe anemia; the ALJ failed properly to weigh the opinions of M.F.T. Sharon Meckenstock, Dr. Barnett, and the treating psychiatrists; and the ALJ erred in not recontacting Dr. Kuo and Dr. Lessenger.

IV. <u>Medical Record</u>

Plaintiff was treated at the Tulare Community Health Clinic from May 2001 through the November 2006. (A.R. 174-318, 401-456.) Progress notes from 2001-2002 and 2004-2005 reflect complaints of dizziness, poor sleep, headaches, and neck and back pain; mentally, Plaintiff reported depression and anxiety without being suicidal that was treated initially with Remeron, which helped a little, and later with Nortriptyline. (A.R. 206, 219-20, 225, 240, 255-57, 268, 271, 276-77, 280-81, 297, 303, 308, 310-15, 429.) There were few objective findings noted by Dr. Kuo or the other examiners aside from mild epigastric findings and slight pallor. (A.R. 314, 225.)

In November 2002, non-examining state agency medical consultant Alfred Torre, M.D., opined that as a result of her thrombocytopenia, Plaintiff could lift and carry twenty pounds occasionally, ten pounds frequently, and stand and/or walk and

sit about six hours in an eight-hour workday. (A.R. 381-89.)

On January 30, 2003, consulting, examining physician Michael S. Barnett, M.D., L.T.D., a psychiatrist, performed a psychiatric evaluation of Plaintiff with an interpreter after reviewing a previous consulting opinion from 1998. (A.R. 166-68.) Plaintiff did not know her age or the length of her marriage, although she knew she had four daughters at home; she ran away from the Communists in Laos, where her brother was murdered by soldiers, and she saw a lot of people shot and killed. She had never attended school. She complained of crying, not sleeping well, being dizzy and depressed, feeling irritable and withdrawn, and having decreased appetite, low energy, and poor concentration. She heard things, including voices daily telling her that they wanted to kill her and that she was stupid. She felt that people watched her and wanted to hurt and kill her. At night there was an evil force or "demons" who wanted to get her; when attempting to sleep, she saw her dead parents trying to stab her. She would awaken mid-cycle and be unable to go back to sleep. When angry she had thought of killing herself, but she had never attempted suicide. (A.R. 166.) She had begun treatment at Visalia Mental Health in 1993, but she stopped going. She reported that she needed assistance dressing and bathing herself and had been isolated for a long time. She was casually and sloppily dressed, appeared depressed, tearful, flushed, and "chronically mentally ill," exhibited unspecified psychotic symptoms, had no involuntary movements, and had a flat affect and meek demeanor. (A.R. 167.) She did not know the date, month, or year, could not perform serial threes or simple calculations, repeated two digits

forward and zero digits backward, recalled zero out of five
objects in five minutes, could not describe either the similarity
or difference between an apple and an orange, could not interpret
proverbs, and did not know what she would do in a fire in a
theater or if she found a stamped, addressed envelope on the
sidewalk. (A.R. 167.)

Dr. Barnett diagnosed PTSD, chronic, schizo-affective
disorder, depressed; no diagnosis on Axis II; and a global
assessment of functioning (GAF) of 48. Dr. Barnett opined that
Plaintiff was functioning at a very low level and needed adequate
doses of antidepressant and neuroleptic medications to control
her symptoms; given her lack of education and poor adaptation to
living in this country, it was doubtful that she would be able to
work even with appropriate treatment. Because of her low level of
functioning, depressive and psychotic symptoms, and social
isolation, it was unlikely that she would be able to work
regularly or perform work activities on a consistent basis; lack
of spoken English would cause great difficulty in being able to
understand, remember, and carry out simple, one-step or two-step
job instructions; she would be unable to engage in work
activities without special or additional supervision; her
symptoms would interfere with the completion of a normal work day
or week; and she would be incapable of interacting with
supervisors, coworkers, or the public or of coping with the
stressors encountered in a normally competitive workplace. The
prognosis was poor, due in part to lack of education and poor
acculturation, although treatment would be beneficial. (A.R. 167-
68.)

In February 2003, state agency consultant Glenn Ikawa, M.D., concluded that due to schizo-affective disorder, depressed type, and PTSD, Plaintiff had moderate restriction of activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; she was moderately limited in the ability to understand, remember, and carry out short and simple instructions, perform activities within a schedule, maintain regular attendance, complete a normal workday and workweek without interruptions from symptoms, be punctual, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted, make simple, work-related decisions, interact appropriately with the general public, supervisors, coworkers, and peers, adapt to changes in the work setting, travel, and set goals or make plans. Plaintiff was markedly limited in the ability to understand, remember, and carry out detailed instructions. Dr. Ikawa concluded that she was unable to perform basic work activities on a sustained basis. (A.R. 360-79.)

With respect to Plaintiff's physical impairments, Plaintiff's blood platelet count was low in November 2000 (31), and contemporaneous treating records of Dr. Nauman Qureshi noted mild or borderline anemia. (A.R. 316, 302, 300.) Plaintiff was referred to Dr. Kuo. (A.R. 298.) In December 2001, Plaintiff's platelet count (25) and iron (14) were low. (A.R. 294.) Hematopathalogical reports of Dr. Gary A. Walter, M.D., and Leonard R. Miller, M.D., in October 2001 revealed mild to moderate microcytic/hypochromic anemia, an iron deficiency type

of the disease, and marked thrombrocytopenia of speculative
etiology. (A.R. 293, 287.) In April and July 2002, platelet count
(35, 21) and iron (16, 19) were still low. (A.R. 272-74, 279.)
Dr. Samuel Kuo, M.D., performed a bone marrow aspiration and
biopsy in August 2002, and Dr. Gary A. Walter, M.D., diagnosed
normocellular to mildly hypercellular bone marrow exhibiting mild
megaloblastic changes of the erythroid series, increased
megakaryocytes with immature forms, adequate stainable iron, and
negative for bone marrow fibrosis or metastatic disease. There
was adequate bone marrow response to the persistent
thrombocytopenia. (A.R. 256-57, 260-62.) In September and October
2002, platelet counts (24, 21) were low. (A.R. 251, 254.)

A gap exists in the Tulare Community Health Clinic notes
after October 2002 until February 2004. (A.R. 244-45.) Platelet
counts were low in February 2004 (26), April 2004 (17), May 2004
(19), July 2004 (13), August 2004 (20), November 2004 (25),
December 2004 (13), February 2005 (17), April 2005 (19, 31, 43),
and May 2005 (27, 90, 54, 12). (A.R. 196, 201-03, 207, 209, 212,
217, 223-24, 232, 237, 239, 243- 244). Ferritin was within the
normal range in December 2004. (A.R. 230-31.)

Plaintiff had been prescribed Prednisone in May 2004 and had
been taking it "off and on"; she had been partially responding.
(A.R. 214, 218, 240.) In December 2004, next to an assessment of
"ITP," treater's notes reflect a question as to whether or not
Plaintiff was non-compliant. (A.R. 228.) While taking Prednisone
in January 2005, Plaintiff's legs swelled; the dose was adjusted
upward on March 5, 2005, while Plaintiff was awaiting surgery.
(A.R. 226, 220.) Treating notes of March 17, 2005, reflect that

Plaintiff had stopped taking Prednisone because of "soreness on her legs" and an inability to tolerate it. (A.R. 218-19.) A note from April 7, 2005, clarifies that Plaintiff "generally stopped the medication by herself." (A.R. 214.) It would be necessary for her to have high dose intravenous immungloburin therapy before surgery. (A.R. 214.)

In March 2005, Dr. Kuo diagnosed thrombocytopenia, autoimmune disease, esophageal reflux disease, and depression, and noted that Plaintiff stopped taking Prednisone by herself. A recent lupus panel showed borderline increase of ANA, elevations of SSA antibodies, elevated thyroid antibodies, and slightly low C at 80. A general surgery evaluation was anticipated. (A.R. 218, 214.) In April 2005, Dr. Kuo noted that Plaintiff had elevated SSA, "thyroid parasites oral antibodies," immunothyromobcytopenia (ITP), and possible autoimmune disease.

Consulting, examining psychologist Leslie H. Lessenger, Ph.D., performed a psychological evaluation of Plaintiff on March 24, 2005, with the assistance of a Lahu interpreter. (A.R. 169-71.) Dr. Lessenger reviewed records, took a diagnostic history, performed a mental status exam and interview, and administered the Test of Nonverbal Intelligence-3 (TONI-3), the Rey 15 Item Memory Test, and the Test of Memory Malingering (TOMM). Plaintiff reported that her problems had begun two years earlier; she had back pain, trouble breathing, and abdominal pains. She was frequently depressed, which caused her to take a pill and a nap; she had difficulty sleeping without medication, had frequent nightmares and daytime intrusive thoughts about her dead father, and she ate poorly because of abdominal pain. Sometimes her

husband had to bathe her because dizziness caused her to fear falling; her activities were lying in bed or on the sofa. Plaintiff was casually dressed, hygiene was adequate, she avoided eye contact with the evaluator and rarely looked at the interpreter, and mood was depressed and blunted. Plaintiff was unable to give the month or the name of her town. Plaintiff reported having four children but could not give their ages or the name of their schools, although with prompting she identified one child as a teenager and reported that all the children were over five years of age. Motivation was questionable. She reported hearing vague voices that "aren't there," but she could not understand what they said. On the TONI-3, Plaintiff was unable to answer any of the first five items correctly despite two reviews of the sample items. Dr. Lessenger concluded that the Rey memory test might not be an appropriate assessment for Plaintiff, who had never been to school. On the TOMM, Plaintiff was unable correctly to identify the sample items despite two trials, scores were both below chance, and one trial clearly suggested that Plaintiff knew the correct answer and deliberately chose the incorrect answer. Plaintiff's performance was consistent with malingering. The diagnostic impression was malingering, history of PTSD, and depression; diagnosis on Axis II was deferred; the GAF was unknown. Dr. Lessenger concluded that Plaintiff, who was thirty-eight years old, was clearly malingering cognitive deficits; thus, it was not possible to assess her cognitive and psychological functioning with any confidence. (A.R. 170-71.)

On April 8, 2005, consulting, examining physician Vinay K. Buttan, M.D., who was certified in internal medicine, evaluated

Plaintiff for complaints of dizziness and weakness, depression, anxiety, and not feeling like working. (A.R. 172-73.) Plaintiff was four feet four inches tall, 119 pounds, and the exam produced normal findings. The impression was pancytopenia, etiology undetermined, depression, and anxiety. He opined that the weakness and dizziness could be secondary to pancytopenia, especially anemia, but he did not have reports of her hemoglobin and hematocrit values. On the basis of history and exam, Dr. Buttan concluded that Plaintiff's main problems were mental rather than physical; there was no restriction of sitting, standing, or walking; she might not be able to do heavy physical exertion because of anemia, but there was no restriction of working with her hands. She needed a psychiatric evaluation and medication adjustment to control depression and anxiety. (A.R. 172-73.)

State agency medical consultant Emanuel H. Rosen, M.D., opined on April 20, 2005, that Plaintiff had no medically determinable mental impairment; she had a prior history of credibility concerns noted and considered in context with the current consulting examiner's opinion (apparently a reference to Dr. Lessenger) and the Plaintiff's lack of treatment. (A.R. 340-53.)

State agency medical consultant George G. Spellman, M.D., opined on April 25, 2005, that Plaintiff's ITP resulted in an ability to lift fifty pounds occasionally and twenty-five pounds frequently, and stand and/or walk and sit about six hours per work day, with no other limitations. (A.R. 330-37.)

Prednisone was reinstated in May 2005. (A.R. 206.) On May 5,

2005, Dr. Kuo stated that Plaintiff had thrombocytopenia, splenomegaly, and elevated ANA with thyroid proxitase auto-antibodies; he would repeat the high dose of IVIG therapy if clinically indicated. (A.R. 205.)

On May 25, 2005, Dr. Cesar Ramos, M.D., evaluated Plaintiff and diagnosed intrahepatic thrombocytopenic purpura. (A.R. 190.) Plaintiff denied dizziness or headaches, but she reported weight loss at 116 pounds. He noted her progressive drop in platelet count "despite oral medication." (A.R. 190.) She would be given Prednisone to improve her platelet count prior to her surgery. (Id.)

In a note regarding treatment on May 26, 2005, treating physician Dr. Kuo referred to Plaintiff's most recent failure to comply with treatment:

> The patient has been very non-compliant to her treatment. She was started on Prednisone 40 mg. once a day on 5/5/05. Her platelet count was 27000 (sic) a week after starting 40 mg of Prednisone her platelet count was 90000 on 5/12/05. Because of [s]ide effects related to Prednisone the patient felt weak and itchy on the skin and cut down her medication. Her platelet count was 54000 on 5/16/05 and 12000 on 5/24/05. Her splenectomy was postponed due to low platelet (sic).

(A.R. 188.) Dr. Kuo's assessment was "Immunothrombocytopenia responding to high dose Prednisone." (Id.)

On June 8, 2005, Dr. Ramos performed a splenectomy without complications. (A.R. 181-84.) There were no abnormal findings upon pre-operative examination. The surgical pathology report of Gary A. Walter, M.D., was congestion, mild increase in white pulp regions, and negative for splenic fibrosis; the post-operative diagnosis was ITP (idiopathic thrombocytopenic purpura). (Id.) On

June 12, 2005, Plaintiff was discharged with an improved platelet count; she was doing fine, had improved at discharge, and the doctor stated, "Activity ambulatory, but no heavy physical exertion. Disability approximately 4-6 weeks." (A.R. 179.)

On June 16, 2005, Dr. Kuo noted that Plaintiff had tolerated the surgery well, and stitches had been removed; the assessment was immunothrombocytopenia post-splenectomy, and dizziness; the plan was to continue observation and repeat blood tests in two weeks. (A.R. 176.) By July 2005, Plaintiff's platelet count was within the normal range. (A.R. 175.)

On July 14, 2005, the clinic progress note reflected that Plaintiff's ITP post-splenectomy was in remission. (A.R. 429.) Plaintiff continued to suffer mild left upper quadrant pain and nightmares. (Id.) In August, Plaintiff complained of being tired all the time and depressed. The assessment was fatigue, dizziness, and depression. (A.R. 428.)

Two non-examining state agency physicians, psychiatrist Archimedes Garcia and Carmen E. Lopez, M.D., assessed Plaintiff's RFC on July 29, 2005, and August 8, 2005, respectively. They concluded that there had been medical improvement with respect to her thrombocytopenia based on Plaintiff's surgeon's post-surgery assessment of no heavy work for four to six weeks. (A.R. 319-20.) Dr. Garcia completed a psychiatric review technique finding that Plaintiff's affective disorder was not severe (A.R. 329.) Dr. Lopez concluded that Plaintiff could lift and carry one hundred pounds occasionally, twenty-five pounds frequently, and stand and/or walk and sit about six hours in a workday with no limitations. (A.R. 321-28.)

On August 25, 2005, treating physician Dr. Kuo opined on a form that based on a "clinical diagnosis," without mention of any specific findings or test results, Plaintiff had had depression for two to three years, and it was stable on medication (Nortriptyline) with a fair prognosis. (A.R. 390-94, 390.) He did not complete the physical RFC portion of the form. However, with respect to the effect on Plaintiff's mental and emotional capacities of Plaintiff's impairments, she had poor ability (i.e., a seriously limited ability to function, but all functioning was not precluded) to follow work rules, relate to coworkers, deal with the public, interact with supervisors, deal with work stress, function independently, use judgment, maintain attention and concentration, and understand, remember, and carry out complex, detailed but not complex, and even simple job instructions. Further, she had poor ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (A.R. 390-94.)

In September 2005, Plaintiff's platelet result was high. (A.R. 425.) Dr. Kuo noted the "good response of the platelet count." (A.R. 423.) Plaintiff continued to complain of dizziness, fatigue, and severe depression; she reported that she had been taking medication "according to her previous doctor" at Mental Health, but there was no improvement, and re-evaluation was required. The assessment was severe fatigue, chronic dizziness, and history of depression. Mental health evaluation for adjustment of medication was recommended. (A.R. 423.)

In October 2005, progress notes from a post-operative

followup at the Tulare Community Health Clinic reflect that
Plaintiff was doing fairly well with minimal pain and a platelet
count of 240,000. The plan was discharge. (A.R. 178.)

In November 2005, Plaintiff reported nightmares, difficulty
sleeping, and inability to see her psychiatrist; the assessment
was severe fatigue, chronic dizziness and depression, and
insomnia. Medications were adjusted. (A.R. 421-22.) Treating
physician Dr. Kuo essentially repeated his opinion of three
months earlier, concluding that as a result of Plaintiff's
depression, dizziness, and fatigue, and based on clinical
findings of fatigue and weakness assessed by the doctor for about
two to three years after she had last seen her mental health
doctor, Plaintiff had the same poor abilities, and she was unable
to do any wage-earning work. (A.R. 395-99.) For two years,
Plaintiff had been able to sit less than thirty minutes at a
time, stand and/or walk less than ten minutes at a time, and sit
or stand less than thirty minutes over an eight-hour period. The
clinical findings that supported the assessment were the
"clinical presentation." (A.R. 397.) Although he did not list any
objective findings, Dr. Kuo stated that the assessment was based
upon his objective findings and not only on the person's
subjective comments. (A.R. 397-98.)

In January 2006, Plaintiff reported weakness but better
sleep; the assessment was dizziness, fatigue, and depression
along with peptic ulcer disease and history of depression. (A.R.
419-20.) The diagnosis continued in March 2006. (A.R. 417.) In
May 2006, Plaintiff's platelet count was high. (A.R. 412.) She
complained of epigastric pain. (A.R. 410.) In June 2006,

Plaintiff reported that her dizziness fluctuated from really bad to relatively light on some days. Nortriptyline was reduced to lessen the dizziness. (A.R. 407.) Plaintiff reported being very weak in July 2006. Medications were continued; the assessment was chronic dizziness, peptic ulcer disease, and insomnia. (A.R. 405.)

Plaintiff reported to Sharon Meckenstock, MFT, in an initial assessment in July and August 2006 that although Plaintiff had received mental health therapy and medications a few years before, it did not help, so she stopped her treatment. (A.R. 442-49.) She had never been hospitalized for mental conditions and was not on any psychiatric medications. She reported that she had trouble sleeping; she had little energy, found little pleasure in anything, and could not concentrate due to her shame because her fifteen-year-old daughter had been removed from Plaintiff's home and was in a foster home for excessive truancy. The family was under a child welfare watch. Plaintiff and her husband had lost control of their several children, and this had caused Plaintiff's depression, which she had felt for about a year, to worsen. Plaintiff reported doing nothing in the home. She heard voices, mostly at night, that spoke clearly, but Plaintiff was vague when asked what they said, and she did not share what was said. (A.R. 445.)

A mental status exam by Meckenstock found Plaintiff clean and appropriately dressed, sitting lethargically, with clear and well understood speech, very sad and almost indifferent affect, thought content that indicated no mental impairment, intact memory, average intelligence based on her apparent understanding

of the questions, and speech that contained coherent sentences with apparently no rambling. The Lahu interpreter had no difficulty understanding Plaintiff. (A.R. 445.)

Meckenstock diagnosed major depressive episode, recurrent, severe with psychotic features and melancholic features, rule out adjustment disorder with depressed mood, chronic, with diagnosis on Axis II deferred; the GAF was 45. (A.R. 446-47.) The assessment form itself states that mood disorders such as major depression "must be referred for psychiatric evaluation." (A.R. 449.) The plan was therapy and medications. (A.R. 448.)

In September 2006, Plaintiff reported little change. (A.R. 441.) A wellness plan was created, and Plaintiff went to therapy with a goal of washing dishes twice a day. Plaintiff was very emotional and planned to see the doctor in November to get medications; she was angry that she could not do and go as others could. (A.R. 439.) Plaintiff reported an improvement in her chronic dizziness in September 2006. The assessment was hypercholesterolemia, chronic dizziness, and history of peptic ulcer disease. (A.R. 403.)

In November 2006, Plaintiff had the flu and still did nothing at home. (A.R. 438.) Her platelets were at 11, with a reference range of 11.5 through 16.8. (A.R. 430.) Plaintiff weighed 108 pounds. (A.R. 435.) When she saw Dr. Maximo A. Parayno, Jr., M.D., in November for a medication evaluation, she continued to complain of depressive symptoms, problems with sleep, low energy, and seeing ghosts at night. Plaintiff was alert but disoriented as to time, place, and situation, and she did not know the date, her address, her telephone number, or her

date of birth; her affect was flat and mood depressed; she had
poverty of ideations and content, but no suicidal or homicidal
ideations; memory and concentration appeared rather suspect; and
judgment and insight were limited. Dr. Parayno's assessment was
major depressive disorder, recurrent with psychotic features.
(A.R. 434.) The doctor prescribed Sertraline for depression and
nightmares, Seroquel to enhance sleep and modulate the
nightmares, and Trazodone to enhance sleep. (A.R. 434.) In
December 2006, the wellness plan was completed. (A.R. 433.)

On January 4, 2007, Dr. Kuo opined that since 2000,
Plaintiff had been precluded from performing any work, including
sedentary work, by her depression, based on unspecified clinical
findings, such that she could sit less than an hour at one time
or over an eight-hour period, and stand and/or walk less than
fifteen minutes at one time and less than thirty minutes over an
eight-hour period. (A.R. 400.)

In February 2007, Xavier Lara, M.D., examined Plaintiff as
part of medication support services. Plaintiff complained of
sleeping problems, mild depression daily and nightmares almost
daily, and sounds of war. Plaintiff looked sad and tearful and
had underlying hopelessness, but she was not suicidal or
homicidal. Blood tests were normal. She had slow speech of low
volume, down mood and flat affect, fair insight and judgment,
good impulse control, and she was clear, coherent, alert, and
oriented, although she looked a little confused. She did not know
her age. Plaintiff was also taking Zoloft in addition to the
medications listed by Dr. Parayno. The assessment was major
depressive disorder with psychotic features, and post-traumatic

stress disorder traits. The plan was validation, reassurance, education, and increasing the doses of Seroquel and Zoloft. (A.R. 431.)

V. Plaintiff's Testimony and Reports

Plaintiff testified at the hearing held on January 10, 2007, that she was born in 1966, was married, and had four children. (A.R. 461.) She did not know the ages of her children, the name of the doctor whom she had seen many times, or whether the place she lived was a house or apartment. (A.R. 462, 464.) She did nothing at home; her husband helped her bathe and dress. Once in a while she went to church with her husband. She had never worked. (A.R. 462-63.) She had depression, trouble sleeping, abdominal and back pain, and she heard voices every night. The voices said they would kill her and sometimes said to go and hit other people. She got probably an hour or not even an hour, and sometimes only ten minutes, of sleep at night. She could not sit long, could only walk very slowly, and could not lift much. (A.R. 464-65.) When she was depressed, she felt scared to die because she had trouble sleeping. She did not speak, read, or write English or read or write in any language. (A.R. 465.) She was dizzy in the daytime and could not move much; the medication she took when she got dizzy did not help much. She did not cook because she felt sick, and she did not do laundry because of dizziness and trouble moving around. (A.R. 466.) When she was depressed, she got angry and cried because of trouble sleeping. (A.R. 466.)

In her report of continuing disability interview, Plaintiff reported in December 2004 that she was disabled from hearing

voices, trouble sleeping, dizziness, and depression. Her daily activities were walking around, grooming and attending to her personal needs, visiting relatives monthly, and sometimes going to church. She could not focus when she stood because she got really bad dizzy spells that would come and go, even at home. She had trouble sleeping, so she felt tired all the time. (A.R. 119-28.)

Plaintiff reported through her husband in May 2005 and in September 2005 (A.R. 146-52, 154-64) that her condition had worsened since her last report. On about January 1, 2005, she experienced hallucinations, hearing voices from dead people, a sleeping disorder with three nightmares per night, paranoia, emotional disturbance, confusion, poor memory and concentration, major depression disorder, severe anxiety disorder, low blood cells, body weakness, and suicidal attempts. Her new physical or mental limitations since her last disability report were anemia syndrome, severe frustration, poor functioning problem, illusion disorder, dizziness disorder, chronic headaches, hallucination syndrome, emotional depressive, nightmares, dizziness, post-traumatic stress disorder, difficult breathing, and major depression. Her new illnesses, injuries, or conditions since the last disability report were abdominal pain (spleen), shortness of breath, hallucination syndrome, emotional depressive, nightmares, major depression, and suicidal attempts. (A.R. 146-52.) Surgery to remove the spleen occurred or was about to occur. (A.R. 148.) Plaintiff took Nortripyline as an anti-depression medication, Prednisone for shortness of breath, Diphenhydramine for sleeping and itching, and Famotidine for sleeping syndrome. (A.R. 149.)

Shortness of breach, severe frustration, poor functioning, anxiety disorder, PTSD, poor memory problem, confusion problem, major depression, emotional disturbance, dizziness, chronic headaches, and hallucination syndrome affected her ability to care for her personal needs. Abdominal pain (spleen), anemia symptoms, body weakness, shortness of breath, difficult thinking (poor memory), severe functioning, poor concentration, confusion, emotional/depressive problem, and anxiety disorder were the changes in her daily activities. (A.R. 150.) The aforementioned symptoms or conditions, along with sadness, feelings of guilt, paranoia disorder, and ulcer pain rendered her totally disabled. (A.R. 151.)

VI. <u>Testimony of Plaintiff's Husband</u>

Plaintiff's husband, Mai Saesee, testified that he had been married to Plaintiff for twenty years and lived with Plaintiff and their children, aged 18, 17, 15, and 9. (A.R. 467-68.) Mr. Saesee confirmed that Plaintiff did not cook, do laundry, or clean because of pain and dizziness that Plaintiff said came with getting up, sitting, or moving fast. (A.R. 468.) Plaintiff's parents had the same mental illness. Plaintiff stayed quiet at home. Her dizziness began in 1999. She began to be depressed about four or five years before the hearing. (A.R. 474.) None of her problems were getting better. (A.R. 469.) Mr. Saesee gave her medications and took her to the doctor; she had problems trying to sleep because of nightmares that she related after she awoke; she had nightmares not every night but once in a while, and she had problems sleeping through the night, like an hour or thirty minutes sleep. (A.R. 471.) He and his daughter helped Plaintiff

25

bathe and dress; he took her to the store sometimes and told her stories, and this made her feel better sometimes. (A.R. 471-72.) After her spleen was removed, her dizziness and depression were still the same; she was tired a lot, did not walk much during the day, and he did not know how long she could stand; she did not lift anything. (A.R. 472.) He took her to therapy twice a month and to the doctors every two months for medication refills. (A.R. 473.)

VII. Third-Party Reports

Jennifer See, Plaintiff's cousin, completed an adult third party function report in January 2005 in which she reported seeing Plaintiff every day. (A.R. 129-45.) Plaintiff stayed in the apartment, ate three meals, and went to bed, but she did not get good sleep because of nightmares and worrying about her dead father coming back for her in her dreams. She did not understand English, read, or know how to count; she was very quiet, afraid, worried, and depressed. Plaintiff did not understand or remember much, and she could pay attention for five minutes, or two to five minutes. She needed prompting to groom herself and take medication.

VIII. Testimony of the Vocational Expert

Mr. Jose L. Chaparro, a vocational expert, testified that someone with Plaintiff's age, education, and work history, with no established exertional limitations, but who was limited to simple, routine, repetitive work, could perform work in the regional or national economy, including 1) commercial or institutional cleaner, heavy and unskilled, DOT 381.687-014, with 14,000 jobs in California and about 440,000 nationally; 2)

26

poultry offal icer, heavy and unskilled, DOT 525.687-054, with
4,500 jobs in California and nationally about 45,000; and 3)
brush clearing laborer, heavy and unskilled, DOT 459.687-010,
with about 6,600 jobs in California and nationally about 66,000
jobs. (A.R. 474-75, 14.) His testimony was in conformity with the
Dictionary of Occupational Titles (DOT). (A.R. 475.)

    The VE testified that assuming the same factors as in the
previous hypothetical but further assuming that the person had
occasional problems maintaining attention, concentration, and
pace, there was no work in the regional or national economy that
the person could perform. (A.R. 475-76.)

    IX. The ALJ's Findings regarding Plaintiff's Credibility

    The ALJ noted Plaintiff's complaints of back pain,
dizziness, fatigue, weakness, and depression (A.R. 16), but he
expressly concluded that Plaintiff's subjective complaints were
not credible (A.R. 18). Plaintiff argues that the ALJ did not
state legally sufficient reasons for his findings.

        A. Legal Standards

    It is established that unless there is affirmative evidence
that the applicant is malingering, then where the record includes
objective medical evidence establishing that the claimant suffers
from an impairment that could reasonably produce the symptoms of
which the applicant complains, an adverse credibility finding
must be based on clear and convincing reasons. Carmickle v.
Commissioner, Social Security Administration,, 533 F.3d 1155,
1160 (9th Cir. 2008). In Orn v. Astrue, 495 F.3d 625, 635 (9th Cir.
2007), the court summarized the pertinent standards for
evaluating the sufficiency of an ALJ's reasoning in rejecting a

27

claimant's subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" Morgan, 169 F.3d at 599 (quoting Lester, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." Id. Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." Id.

> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. See S.S.R. 02-1p (Cum. Ed.2002), available at Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity, 67 Fed.Reg. 57,859-02 (Sept. 12, 2002); S.S.R. 96-7p (Cum. Ed.1996), available at 61 Fed.Reg. 34,483-01 (July 2, 1996). An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. See 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); see Daniels v. Apfel, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." Fair, 885 F.2d at 603; see also Thomas, 278 F.3d at 958-59.

Additional factors to be considered in weighing credibility include the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the

person receives or has received for relief of the symptoms; any measures other than treatment the claimant uses or has used to relieve the symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529, 416.929; S.S.R. 96-7p.

B. Analysis

Here, the ALJ expressly considered the evidence of malingering and exaggeration of symptoms observed by Dr. Lessenger as indicating that Plaintiff's subjective claims were not reliable. (A.R. 18.) Amplification of symptoms can constitute substantial evidence supporting the rejection of a subjective complaint concerning the severity of symptoms. Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993). Here, the examining specialist's opinion was based on a careful attempt to discern Plaintiff's condition and capacities, and it constitutes a clear and convincing reason for the ALJ's findings.

The ALJ also considered inconsistencies in Plaintiff's reports of symptoms, noting her testimony that nocturnal voices told her to hurt others and her inconsistent reports of voices telling her she was stupid and that they wanted to kill her, to follow "me," and even voices not capable of being understood; no report of audio hallucinations but descriptions of visions of ghosts to Dr. Parayno; and reports of no hallucinations to Dr. Lara. (A.R. 18.)

Inconsistent statements are matters generally considered in evaluating credibility and are properly factored in evaluating the credibility of a claimant with respect to subjective complaints. In rejecting testimony regarding subjective symptoms,

29

permissible grounds include a reputation for dishonesty;
conflicts or inconsistencies between the claimant's testimony and
her conduct or work record, or internal contradictions in the
testimony; and testimony from physicians and third parties
concerning the nature, severity, and effect of the symptoms of
which the claimant complains. Moisa v. Barnhart, 367 F.3d 882,
885 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th
Cir. 2002). The ALJ may consider whether the Plaintiff's
testimony is believable or not. Verduzco v. Apfel, 188 F.3d 1087,
1090 (9th Cir. 1999).

Here, the inconsistencies in the record and the express
assessment of malingering supported the ALJ's reasoning. The ALJ
also permissibly drew reasonable inferences from the evidence.
Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The ALJ
reasoned that Plaintiff's testimony was incredible because she
testified that she could not remember if she lived in a house or
an apartment but remembered she did not work in the yard, and
that she did not remember how many children she had despite
living with them. (A.R. 18.) It was reasonable for the ALJ to
consider the evidence and conclude that these basic
inconsistencies reflected on the credibility of Plaintiff, who
had been found to have been malingering with respect to cognitive
deficits.

Plaintiff suggests that cultural or linguistic factors might
have caused Plaintiff's confusion. However, it is not the role of
this Court to redetermine Plaintiff's credibility de novo;
although evidence supporting an ALJ's conclusions might also
permit an interpretation more favorable to the claimant, if the

ALJ's interpretation of evidence was rational, this Court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation. <u>Burch v. Barnhart</u>, 400 F.3d 676, 680-81 (9th Cir. 2005).

Although the inconsistency of objective findings with subjective claims may not be the sole reason for rejecting subjective complaints, <u>Light v. Chater</u>, 119 F.3d 789, 792 (9th Cir. 1997), it is one factor which may be considered with others, <u>Moisa v. Barnhart</u>, 367 F.3d 882, 885 (9th Cir. 2004); <u>Morgan v. Commissioner</u> 169 F.3d 595, 600 (9th Cir. 1999); <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005). The ALJ noted that although Plaintiff testified that she did virtually nothing due to her depression, the relatively recent evaluation of Dr. Lara in February 2007 indicated that although Plaintiff was depressed daily, her depression was only mild. (A.R. 18.) Plaintiff asserts that this takes matters out of context. However, the ALJ appropriately relied on the recent report of a treating source. The ALJ's reasoning was not only specific and legitimate but also clear and convincing. Further, it was based on substantial evidence in the record.

As to the probative force of the evidence, as previously noted, it is only where there is no affirmative evidence of malingering that the ALJ's reasons must be clear and convincing. Here, there was affirmative evidence of malingering. However, the multiple reasons stated by the ALJ for his credibility findings were not only specific and cogent, but were also clear and convincing in force, and they were supported by substantial evidence in the record.

The Court concludes that the ALJ cited specific, cogent, clear, and convincing reasons for rejecting Plaintiff's subjective complaints, and that the ALJ's reasons were properly supported by the record and sufficiently specific to allow this Court to conclude that the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit Plaintiff's testimony.

X. <u>The ALJ's Findings concerning Third Party Evidence</u>

Plaintiff challenges the ALJ's treatment of Plaintiff's husband's testimony and the report of Plaintiff's cousin, Jennifer Lee.

A. <u>Legal Standards</u>

It is established that lay witnesses, such as friends or family members in a position to observe a claimant's symptoms and daily activities, are competent to testify to a claimant's condition; the Commissioner will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work. <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918-19 (9th Cir. 1993). An ALJ cannot discount testimony from lay witnesses without articulating specific reasons for doing so. <u>Id.</u> at 919. In <u>Dodrill</u>, it was held that the matter required remand in part because although the ALJ had expressly rejected lay evidence, the ALJ had failed to give reasons germane to each witness for rejecting the evidence.

B. <u>Mr. Saesee</u>

Here, the ALJ noted Mr. Saesee's testimony that Plaintiff was physically limited due to pain and dizziness. (A.R. 18.) The ALJ had concluded that although Dr. Kuo had prescribed Meclizine

for dizziness, there was no evidence of any medically
determinable impairment that would reasonably be expected to
produce that symptom. (A.R. 16.) The ALJ noted that Plaintiff
took only non-prescription Tylenol and Advil for pain. Further,
her thrombocytopenia had responded to Prednisone and then to
surgery, and Dr. Kuo had described it as being in remission.
(A.R. 16.) The ALJ thus relied on absence of medical evidence to
support Plaintiff's claims, which is a valid, germane reason.
Lewis v. Apfel, 236 F.3d 503, 511-12 (9th Cir. 2001); Thomas v.
Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).

        In addition, the ALJ noted Plaintiff's husband's testimony
that Plaintiff was depressed, stayed home, did no household
chores, had problems sleeping, and had nightmares. (A.R. 18.) The
ALJ stated that Plaintiff's husband did not seem to be aware of
Plaintiff's hearing any voices; Mr. Saesee acknowledged that
despite severe limitations allegedly spanning four to five years,
Plaintiff had only recently resumed mental health treatment; and
the ALJ noted that the husband's direct financial interest in
Plaintiff's continuing to receive SSI income payments further
detracted from his credibility. (A.R. 18-19.)

        The ALJ reasoned that Plaintiff's husband's lack of
awareness of Plaintiff's alleged hearing of voices supported an
inference that her claims were insubstantial. Failure to mention
a symptom that Plaintiff complained of so consistently was
reasonably considered to reflect an absence of seriousness of the
symptom. This reasoning was based on logical inferences drawn
from the evidence. Likewise, the absence of treatment for
allegedly severe, long-standing limitations further supports such

an inference. The ALJ thus stated additional, germane reasons for rejecting Plaintiff's husband's testimony.

Finally, Mr. Saesee had testified that he was not working; he received public welfare and took care of the children. (A.R. 468.) Considering the finances of the family, it was not unreasonable for the ALJ to note the extent of financial interest of Plaintiff's spouse, a characteristic not necessarily shared by all lay witnesses or sources. This reasoning was unlike that found inappropriate in Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996), cited by Plaintiff, in which the status of a witness as a family member was found to be a basis for bias. In the instant case, the ALJ's reasoning was based on specific facts and not membership in the broad class of people whose insights were otherwise appropriately considered.

In summary, the Court concludes that with respect to his conclusions concerning Plaintiff's husband's credibility, the ALJ stated specific reasons that were supported by the record and that were germane to the witness and his testimony.

C. Plaintiff's Cousin

With respect to Ms. Lee, the ALJ noted her third-party function report of January 2005 in which she stated that Plaintiff simply stayed at home and did nothing. (A.R. 19.) The ALJ expressly gave little weight to Lee's statements because at the time the statements were made, Plaintiff had still been suffering weakness and tiredness from thrombocytopenia. (Id.) This reasoning concerned the factual basis for Ms. Lee's statement and thus was specifically related to Ms. Lee's opinion. In view of the complete resolution of Plaintiff's platelet

problem by the subsequent surgery, the reasoning was germane and persuasive. The ALJ also stated that in addition, Ms. See was not subject to examination at the hearing. (A.R. 19.) Although Plaintiff protests that Ms. See could have been subpoenaed, the Court understands the ALJ's reasoning to relate to the specific fact that Ms. See's observations had not been tested by formal questioning at a hearing. This reasoning was likewise germane and specific to the witness.

The Court concludes that the ALJ stated specific, germane reasons, supported by substantial evidence in the record, for rejecting the testimony and reports of the third party witnesses.

XI. <u>The ALJ's Analysis of the Medical Evidence</u>

Plaintiff challenges the ALJ's treatment of the opinions of multiple medical experts.

A. <u>Legal Standards</u>

The standards for evaluating treating source's opinions are as follows:

> By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. See 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." <u>Id.</u> § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. <u>Id.</u> § 404.1527(d)(2)(i)-(ii). Generally, the opinions of

35

> examining physicians are afforded more weight than
> those of non-examining physicians, and the
> opinions of examining non-treating physicians are
> afforded less weight than those of treating
> physicians. Id. § 404.1527(d)(1)-(2). Additional
> factors relevant to evaluating any medical
> opinion, not limited to the opinion of the
> treating physician, include the amount of relevant
> evidence that supports the opinion and the quality
> of the explanation provided; the consistency of
> the medical opinion with the record as a whole;
> the specialty of the physician providing the
> opinion; and "[o]ther factors" such as the degree
> of understanding a physician has of the
> Administration's "disability programs and their
> evidentiary requirements" and the degree of his or
> her familiarity with other information in the case
> record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).

With respect to proceedings under Title XVI, the Court notes
that an identical regulation has been promulgated. See, 20 C.F.R.
§ 416.927.

As to the legal sufficiency of the ALJ's reasoning, the
governing principles have been recently restated:

> The opinions of treating doctors should be given more
> weight than the opinions of doctors who do not treat
> the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th
> Cir.1995) (as amended).] Where the treating doctor's
> opinion is not contradicted by another doctor, it may
> be rejected only for "clear and convincing" reasons
> supported by substantial evidence in the record. Id.
> (internal quotation marks omitted). Even if the
> treating doctor's opinion is contradicted by another
> doctor, the ALJ may not reject this opinion without
> providing "specific and legitimate reasons" supported
> by substantial evidence in the record. Id. at 830,
> quoting Murray v. Heckler, 722 F.2d 499, 502 (9th
> Cir.1983). This can be done by setting out a detailed
> and thorough summary of the facts and conflicting
> clinical evidence, stating his interpretation thereof,
> and making findings. Magallanes [v. Bowen, 881 F.2d
> 747, 751 (9th Cir.1989).] The ALJ must do more than
> offer his conclusions. He must set forth his own
> interpretations and explain why they, rather than the
> doctors', are correct. Embrey v. Bowen, 849 F.2d 418,
> 421-22 (9th Cir.1988).
> Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998);
> accord Thomas, 278 F.3d at 957; Lester, 81 F.3d at

36

1      830-31.

2 Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

3      With respect to the opinions of medical sources other than

4 treating physicians, the medical opinion of a non-treating doctor

5 may be relied upon instead of that of a treating physician only

6 if the ALJ provides specific and legitimate reasons supported by

7 substantial evidence in the record. Holohan v. Massanari, 246

8 F.3d 1195, 1202 (9th Cir. 2001) (citing Lester v. Chater, 81 F.3d

9 821, 830 (9th Cir. 1995)). The opinion of an examining physician

10 is entitled to greater weight than the opinion of a non-examining

11 physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). The

12 uncontradicted opinion of an examining physician may be rejected

13 only if the Commissioner provides clear and convincing reasons

14 for rejecting it. Id.; Edlund v. Massanari, 253 F.3d 1152, 1158-

15 59 (9th Cir. 2001). An ALJ can reject the opinion of an examining

16 physician and adopt the contradictory opinion of a nonexamining

17 physician only for specific and legitimate reasons that are

18 supported by substantial evidence in the record. Moore v.

19 Commissioner of Social Security Administration, 278 F.3d 920, 925

20 (9th Cir. 2002) (quoting Lester v. Chater, 81 F.3d at 830-31).

21              B. Dr. Kuo's Opinion

22      As previously noted, the ALJ stated that there was no

23 evidence of any medically determinable impairment that would

24 reasonably be expected to produce Plaintiff's dizziness or her

25 back pain, which were treated by Meclizine and non-prescription

26 Tylenol and Advil. (A.R. 16.) He further noted that Plaintiff's

27 thrombocytopenia was in remission or cured. (A.R. 16.) The ALJ

28 credited the opinion of Plaintiff's surgeon that Plaintiff would

be disabled from heavy work for four to six weeks after surgery. He then stated:

> Little weight has been given to the opinions of Dr. Kuo, who reported in November 2005 that the claimant is only physically capable of sitting less than 30 minutes and standing and/or walking less than 10 minutes in an 8-hour period (citation omitted) and in January 2007 that the claimant is only capable of sitting less than two hours and standing and/or walking less than 30 minutes in an 8-hour period (citation omitted). The November 2005 report attributes the claimant's physical limitations solely to depression. There are no objective findings cited in support of either of these opinions. Dr. Kuo's treatment records also fail to supply the missing objective basis for his opinions in the absence of the claimant's thrombocytopenia, which he states is now "in remission" and "cured" (Exhibit B-9F, pp. 29, 21). Consequently, I find that the claimant no longer has any physical impairment which significantly affects her ability to perform basic work-related activities.

(A.R. 16.)

The ALJ also stated that the evidence supported a finding that as of April 1, 2005, medical improvement had occurred with respect to Plaintiff's mental impairments. He noted Plaintiff's reports of improved symptoms and Dr. Lessenger's finding that Plaintiff was malingering. (A.R. 17.) The ALJ noted the state agency consultants' opinions that Plaintiff had no medically determinable mental impairment or non-severe mental impairments. (A.R. 17.) He then stated:

> On the other hand, Dr. Kuo, (sic) reported in August 2005 and November 2005 that the claimant's ability was poor in each of the 15 categories of mental functioning he was asked to assess (citations omitted). However, Dr. Kuo fails to cite specific clinical findings on mental status examination of the claimant and his treatment records do not reflect any objective findings to support such extreme mental limitations. In addition, Dr. Kuo is a specialist in internal medicine (citation omitted) rather than psychiatry, and he acknowledges that the claimant had last seen a mental health provider two or three years earlier (citation omitted).

38

(A.R. 18.)

With respect to Plaintiff's physical impairments, the ALJ's reasoning concerning the absence of physical findings cited to support the opinion was specific and legitimate. It is established that a conclusional opinion that is unsubstantiated by relevant medical documentation may be rejected. See Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995). It is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion. Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995); Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). It is permissible for an ALJ to prefer an opinion supported by specific clinical findings and an explanation thereof over a check-off type of form lacking an explanation of the basis for the conclusions. Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (citing Murray v. Heckler, 722 F.2d 499, 501 (9th Cir. 1983)); see Batson v. Commissioner of the Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004).

Here, Dr. Kuo's opinions were brief and were stated on the blanks on forms. His references to clinical findings or presentations were illusory. His own progress notes reflect the absence of objective, clinical findings on examination that would support his limitations. As the ALJ noted, Dr. Kuo had characterized Plaintiff's physical impairment of thrombocytopenia as being in remission and cured. (A.R. 16, 421, 429.) Further, Dr. Kuo had inconsistently attributed physical limitations to

different impairments. The ALJ's reasoning concerning Dr. Kuo's opinion of Plaintiff's physical impairments was specific and legitimate and was supported by substantial evidence in the record.

Plaintiff argues that the ALJ's findings are unsupportable as a matter of law because at the very time the ALJ found that Plaintiff's thrombocytopenia was no longer severe (April 1, 2005), Plaintiff's impairment was so severe that she was awaiting a splenectomy; at that time, no improvement had occurred because Plaintiff's surgery did not occur until June 2005.

Although the improvement after Plaintiff's surgery was marked and dramatic, the record supports the ALJ's interpretation that Plaintiff's ITC had responded even earlier to Prednisone, but Plaintiff was noncompliant. (A.R. 16, 188, 214.) Plaintiff's compliance with her medications was questioned in December 2004. Plaintiff was already complaining of negative side effects in January 2005. She was apparently non-compliant with the increased dose prescribed in the first week of March 2005 because by March 17, she had announced that she had unilaterally terminated the Prednisone. (A.R. 220.) Plaintiff had later stopped the forty-milligram daily dose of Prednisone that had been started on May 5, 2005, which had normalized her blood level. (A.R. 188.)

To the extent that evidence is inconsistent, conflicting, or ambiguous, it is the responsibility of the ALJ to resolve any conflicts and ambiguity. Morgan v. Commissioner, 169 F.3d 595, 603 (9th Cir. 1999). In light of these principles, and considering the medical record, the Court concludes that the ALJ's determination that Plaintiff's ITC was no longer severe as of

April 1, 2005, was not erroneous as a matter of law. The ALJ
legitimately reasoned that at least the severity of Plaintiff's
impairment could be controlled. It is established that an
impairment that can reasonably and effectively be controlled by
medication is not disabling for the purpose of determining
eligibility for SSI benefits. See, Warre v. Commissioner of
Social Security Admin., 439 F.3d 1001, 1006 (9th Cir. 2006); Odle
v. Heckler, 707 F.2d 439, 440 (9th Cir. 1983).

The ALJ repeatedly articulated a concern that Dr. Kuo's
opinions were not based on objective, clinical findings. In
reviewing the ALJ's decision, the Court itself may draw "specific
and legitimate inferences from the ALJ's opinion." Magallanes v.
Bowen, 881 F.2d 747, 755 (9th Cir.1989). In light of the ALJ's
additional rejection of Plaintiff's subjective complaints, the
Court infers that the ALJ necessarily concluded that Dr. Kuo's
opinion was based on discredited subjective evidence. Where a
treating source's opinion is based largely on the Plaintiff's own
subjective description of his or her symptoms, and the ALJ has
discredited the Plaintiff's claim as to those subjective
symptoms, the ALJ may reject the treating source's opinion. Fair
v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989).

Finally, in putting weight on the consulting examiner's
assessment of Plaintiff's condition as malingering, and noting
that Dr. Kuo was an internist, the ALJ stated specific,
legitimate reasons for putting less weight on Dr. Kuo's opinion
concerning Plaintiff's mental capacity. More weight is generally
given to the opinion of a specialist about medical issues related
to his or her area of specialty than to the opinion of a source

41

who is not a specialist. See Holohan v. Massanari, 246 F.3d 1195, 1203 n. 2 (9th Cir. 2001); 20 C.F.R. §§ 416.927(d)(5), 404.1527(d)(5). This reasoning was specific and legitimate in the circumstances of this case.

Plaintiff argues that the ALJ erred by failing to develop the record by re-contacting Dr. Kuo to clarify the differences on the questionnaires and to develop hand and arm limitations. (Brief p. 9.) The duty to develop the record arises where the record before the ALJ is ambiguous or inadequate to allow for proper evaluation of the evidence. 20 C.F.R. §§ 404.1512(e) and 416.912(e); Mayes v. Massanari, 262 F.3d 963, 968 (9th Cir. 2001). Here, the ALJ did not indicate that the record was inadequate; to the contrary, the ALJ evaluated the evidence in the record and implicitly determined that the record was sufficient to permit the ALJ to evaluate Plaintiff's impairments and capacities. Thus, the Court concludes that Plaintiff has not demonstrated that the ALJ erred in failing to re-contact Dr. Kuo.

## C. Opinion of Plaintiff's Surgeon

Plaintiff argues that the ALJ erroneously relied on the opinion of Plaintiff's surgeon as an opinion of a treating doctor as to the absence of overall disability.

In concluding that Plaintiff's thrombocytopenia was no longer a severe impairment, the ALJ stated in pertinent part:

> Although the state agency medical consultants and a consultative examiner concluded that the claimant is is now capable of medium work (citations omitted), greater weight has been given to the treating physician who only restricted the claimant from heavy physical exertion for four to six weeks post-operatively following her splenectomy (citation omitted).

(A.R. 16.)

A treating source is defined by the regulations as follows:

>      Treating source means your own physician,
> psychologist, or other acceptable medical source who
> provides you, or has provided you, with medical
> treatment or evaluation and who has, or has had, an
> ongoing treatment relationship with you. Generally, we
> will consider that you have an ongoing treatment
> relationship with an acceptable medical source when the
> medical evidence establishes that you see, or have
> seen, the source with a frequency consistent with
> accepted medical practice for the type of treatment
> and/or evaluation required for your medical
> condition(s). We may consider an acceptable medical
> source who has treated or evaluated you only a few
> times or only after long intervals (e.g., twice a year)
> to be your treating source if the nature and frequency
> of the treatment or evaluation is typical for your
> condition(s). We will not consider an acceptable
> medical source to be your treating source if your
> relationship with the source is not based on your
> medical need for treatment or evaluation, but solely on
> your need to obtain a report in support of your claim
> for disability. In such a case, we will consider the
> acceptable medical source to be a nontreating source.

20 C.F.R. §§ 404.1502, 416.902.

Here, Dr. Ramos undertook a detailed evaluation of Plaintiff before surgery, performed the surgery, and followed Plaintiff thereafter until discharge. He provided medical evaluation and treatment consistent with the frequency and extent of exposure reasonably anticipated in connection with Plaintiff's surgery and recovery. The Court concludes that the ALJ correctly relied on Dr. Ramos as a treating source.

Further, it does not appear that the ALJ placed unwarranted weight on the opinion or took it out of medical context. The ALJ mentioned it in connection with his evaluation of the severity of Plaintiff's thrombocytopenia, and thus considered it in connection with Plaintiff's physical RFC. (A.R. 16.) In view of the physical nature of the impairment which Dr. Ramos treated,

and considering his reference to heavy physical exertion following surgery, the opinion of Dr. Ramos is reasonably understood to refer to the Plaintiff's physical capacity after the surgery.

D. Finding of Medical Improvement

Plaintiff argues that because Plaintiff's complaints of symptoms remained the same over time, and because Dr. Kuo's diagnoses and assessments did not change over time, the ALJ's finding that there had been a decrease in the medical severity of Plaintiff's mental impairments as of April 1, 2005, was unsupported.

"Medical improvement" is defined as any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled.... A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with [claimant's] impairment(s). 20 C.F.R. § 416.994a(c); Warre v. Commissioner of Social Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006).

As previously noted, the ALJ stated specific, legitimate reasons, supported by substantial evidence, for placing little weight on the opinions of treating physician Dr. Kuo.

In support of his finding, the ALJ contrasted the findings at consulting examiner Dr. Barnes's psychiatric examination in 2003 (Plaintiff was sloppily dressed, in need of daily assistance with dressing and bathing, was tearful, and described seeing her deceased parents attempting to stab her and hearing voices that

44

said they wanted to kill her and that she was stupid) with the
report of consulting examiner Dr. Lessenger in March 2005
(Plaintiff was dressed casually, needed help bathing only
occasionally due to dizziness and fear of falling, did not cry,
and reported only vaguely hearing but not understanding voices
that were not there). (A.R. 17.) The record supports the ALJ's
commonsense comparison of the reports and findings on
examination. Plaintiff painstakingly parses the two mental status
examinations and interviews, but the overall evidence supports
the ALJ's conclusion concerning more mild findings. Plaintiff
characterizes the opinions of the consulting psychological
examiners and body of the medical evidence as supporting
disability, but the Court notes that the ALJ reviewed the medical
evidence of record and interpreted and evaluated it, concluding
to the contrary with legally sufficient reasoning and the support
of substantial evidence.

The ALJ also found that as of April 1, 2005, Plaintiff could
perform simple, routine, repetitive work at all exertional
levels. (A.R. 17.) The ALJ specifically relied on the opinion of
Dr. Lessenger that Plaintiff was malingering, having deliberately
chosen answers she knew were incorrect during the testing
process. (A.R. 17.) The ALJ concluded that Plaintiff's cognitive
and psychological functioning could not be assessed with any
confidence. (A.R. 17.) The ALJ noted that consequently, the state
agency medical consultants found that Plaintiff either had no
medically determinable mental impairment or that her mental
impairments were not severe. (Id.) This reasoning was specific
and legitimate. As previously noted, the ALJ stated specific,

legitimate reasons for rejecting Dr. Kuo's more limited functional limitations. (A.R. 18.)

The Court likewise rejects Plaintiff's characterization of the opinion evidence concerning Plaintiff's mental condition. Although there were multiple opinions that might support a conclusion that Plaintiff suffered more extreme functional limitations than those assessed by the ALJ, that is not determinative. It was for the ALJ to weigh the various opinions in the first instance and to articulate the reasoning employed in reaching the stated conclusions. Where, as here, the ALJ proceeded according to legally correct standards and with the support of substantial evidence in the record, the determination of the ALJ will be upheld. It is not the province of the district court to reweigh the factual and credibility determinations of the ALJ de novo. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999); Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

### 1. Opinion of Sharon Meckenstock, M.F.T.

The ALJ also evaluated the other, more recent evidence concerning Plaintiff's mental impairments.

The ALJ noted that in July 2006, Plaintiff sought services upon suffering cultural shame over her daughter's removal from the home. The ALJ expressly assigned little weight to the opinion of Sharon Meckenstock that Plaintiff had major depressive episode, recurrent, severe with psychotic and melancholic features, and a GAF of 45. (A.R. 18.) The ALJ reasoned that Meckenstock was not an acceptable medical source and had only observed Plaintiff on one occasion when she made the assessment. (A.R. 18.)

The fact that a medical opinion is from an acceptable medical source is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an acceptable medical source because acceptable medical sources are the most qualified health care professionals. 20 C.F.R. §§ 404.1513(a), 416.913(a); Soc. Sec. Ruling 06-03p. For the purposes of this case, acceptable medical sources include licensed physicians and licensed or certified psychologists. 20 C.F.R. §§ 404.1513(a), 416.913(a).

The ALJ thus correctly observed that Meckenstock, whose only certification appeared to be as a marriage and family therapist, was not an acceptable source. Further, the record reflects that she saw Plaintiff only once or twice at the time she completed the initial assessment. The record thus substantially supports the ALJ's implicit conclusion that Meckenstock had limited knowledge of Plaintiff. The ALJ's reasoning in this regard was specific and legitimate.

### 2. Opinions of Drs. Parayno and Lara

The ALJ noted the evaluations of Dr. Parayno in November 2006 and Dr. Lara in February 2007, but the ALJ stated that neither psychiatrist expressed any opinion about Plaintiff's mental limitations or gave her a GAF rating. (A.R. 18.) The record bears out this observation. The ALJ engaged in specific, legitimate reasoning in concluding that the notes of these doctors did not provide good evidence of Plaintiff's mental limitations or otherwise reflect an assessment of her functioning.

/////

E. <u>Residual Functional Capacity</u>

Plaintiff argues that the ALJ erred in formulating Plaintiff's RFC without considering all Plaintiff's impairments, which in combination preclude her from working. She also challenges the limitation to simple, repetitive tasks, and argues that the ALJ was required to recontact Dr. Lessenger.

1. <u>Combined Impairments</u>

Social Security regulations define residual functional capacity as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." <u>Reddick v. Chater</u>, 157 F.3d 715, 724 (9th Cir. 1998) (citing 20 C.F.R. 404, Subpt. P, App. 2 § 200.00(c) and <u>Lester v. Chater</u>, 81 F.3d 821, 833 (9th Cir. 1995)). The Commissioner must evaluate the claimant's "ability to work on a sustained basis." <u>Id.</u> (citing 20 C.F.R. § 404.1512(a)); <u>Lester</u>, 81 F.3d at 833); <u>see</u> 20 C.F.R. § 416.945. A "regular and continuing basis" means eight hours a day, five days a week, or an equivalent work schedule. S.S.R. 96-8p at 1, 2. The process involves an assessment of physical abilities and then of the nature and extent of physical limitations with respect to the ability to engage in work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b).

In assessing a claimant's RFC, it is necessary to consider the limiting effects of all the claimants impairments, even those that are not severe. 20 C.F.R. § 404.1545(a), (e); 20 C.F.R. § 416.945(a), (e); Soc. Sec. Ruling 96-8p at 4; <u>Reddick v. Chater</u>, 157 F. 3d 715, 724 (9th Cir. 1998). However, a condition need not be considered in determining RFC if there is no medical opinion

suggesting that the condition contributes to the Plaintiff's inability to perform work, or if such opinion has been properly discredited. <u>See</u>, <u>Goodenow-Boatsman v. Apfel</u>, 2001 WL 253200, *11 (N.D. Cal. 2001).

The ALJ noted the diagnosis of anemia and the pre-surgery opinions of Dr. Buttan and state agency consultants that Plaintiff could perform medium work. Contrary to Plaintiff's assertion, Dr. Buttan concluded that perhaps Plaintiff could not perform heavy work due to anemia. Thus, it was implicit that Plaintiff could perform medium work.

Although Plaintiff argues that there is no showing that her anemia improved, the record does not reflect a continuing diagnosis of anemia after Plaintiff's recovery from surgery, any treatment for any anemia, or any limitations arising from anemia during that period.

Plaintiff also argues that the record reflects that Plaintiff's breast disease, peptic ulcer disease, and continuing immunological findings support Plaintiff's ongoing complaints of fatigue, dizziness, and weakness. Plaintiff contends that the ALJ ignored these objective findings.

Plaintiff reported breast pain which was followed by a mammogram with benign results in November 2000. (A.R. 315, 317.) Again, in OCtober 2001, a mammogram and ultrasound produced benign results. (A.R. 306, 301, 299.) In April 2006, she was diagnosed with fibrocystic breast disease upon her complaints of bilateral breast pain for four to five days. Clinical signs were symmetrical, fibrocystic disease on the breast, no dominant masses, and minimal tenderness. (A.R. 415.) Mammography and an

49

ultrasound produced benign findings. (A.R. 413.) There are no indications that any functional limitations resulted from any condition of Plaintiff's breasts.

Peptic ulcer disease was diagnosed by Dr. Kuo first in January 2006, and the diagnosis continued through September 14, 2006, at which time Dr. Kuo assessed "History of peptic ulcer disease." (A.R. 419, 403.) Again, Plaintiff has not pointed to any evidence in the record that attributes any symptoms or functional limitations to this condition.

With respect to the immunological findings, Plaintiff asserts that laboratory tests reflecting positive ANA, hepatitis, ESR, and "ITP findings" "objectively support" Plaintiff's ongoing complaints of fatigue, dizziness, weakness, etc. (Brief p. 11, ll. 10-14.) However, many of the test results relate to 2001 (A.R. 283-86) or 2002 (A.R. 258-59). Further, with respect to the many pages of laboratory test results in the record, there is no medical evidence explaining the medical significance of these tests or relating them, causally or otherwise, to Plaintiff's dizziness, fatigue, or other symptoms.

The Court therefore concludes that the ALJ did not erroneously omit impairments from his RFC assessment.

### 2. Limitation to Simple, Repetitive Tasks

Plaintiff argues that no examining source's opinion supports the ALJ's conclusion that Plaintiff was limited to simple, repetitive tasks. However, the ALJ noted the opinions of the state agency psychiatrists who found either that Plaintiff had no medically determinable mental impairment or that her mental impairments were not severe. (A.R. 17.) He cited Plaintiff's lack

of credibility with respect to her claim of marked difficulties in activities of daily living, social functioning, and maintaining concentration, persistence or pace; he then declined to find marked or extreme limitation of such functioning, and further noted Dr. Lessenger's opinion that Plaintiff's cognitive or psychological functioning could not be assessed with any confidence. (A.R. 17.) Considering Plaintiff's limitations with respect to reading and writing, and in view of the range of opinions and Plaintiff's history, it was within the ALJ's province to reconcile the varied and inconsistent strands of medical evidence and to conclude that Plaintiff was limited to simple, routine, and repetitive work.

### 3. Duty to Recontact Dr. Lessenger

Plaintiff argues that the ALJ had a duty to recontact Dr. Lessenger because Dr. Lessenger's report was incomplete: it omitted a functional assessment.

Although a functional assessment may be considered a key element of a report, the present case departs from the general rule. The ALJ considered Dr. Lessenger's report and obviously placed considerable weight on it because of his acceptance of the doctor's assessment of malingering and exaggeration. The ALJ accepted Dr. Lessenger's opinion that because of Plaintiff's dishonesty, it was not possible to assess Plaintiff's cognitive or psychological functioning with any reliability. It would therefore be pointless to recontact Dr. Lessenger, whose ultimate opinion was dependent not simply upon consideration or administration of any particular interview process or test, but rather was based on Plaintiff's own dishonesty and misconduct.

XII. Disposition

Based on the foregoing, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on the application of correct legal standards.

Accordingly, the Court AFFIRMS the administrative decision of the Defendant Commissioner of Social Security and DENIES Plaintiff's Social Security complaint.

The Clerk of the Court IS DIRECTED to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Namor Saesee.

IT IS SO ORDERED.

Dated:   **February 19, 2010**         **/s/ Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE